[No. C004019. Third Dist. Nov. 8, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD RAYMOND RHODES, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III of the Discussion.

**COUNSEL**

Harvey R. Zall, State Public Defender, under appointment by the Court of Appeal, Mark A. Rakich and Tom Carroll, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Edmund D. McMurray and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MARLER, J.**—Defendant Donald Raymond Rhodes was charged with the murder of Robert Lee (Pen. Code, § 187; all further undesignated statutory references are to the Penal Code) and with the theft of his van (Veh. Code, § 10851). A jury found defendant guilty of second degree murder and auto theft. The trial court sentenced him to state prison for 15 years to life on the murder charge and for the upper term of 3 years on the theft charge; the latter sentence was stayed pursuant to section 654. Defendant appeals from the judgment, claiming (1) his counsel should have been relieved due to a

conflict of interest, (2) the trial court failed to instruct sua sponte on involuntary manslaughter, and (3) his hearsay objection to a witness's testimony that he was planning a robbery should have been sustained. We find no merit to these contentions and shall affirm.

## THE CRIMES

Most of the testimony concerning the crimes came from defendant's brother, Dwayne Rhodes, and a friend, Jim Pair. Both were charged initially with the murder, but then were recharged with burglary, vehicle theft, and being an accessory after the fact. Each entered into a plea bargain in which each pleaded guilty to the accessory charge, the other charges were dropped, and each received probation.

On May 14, 1987, Dwayne, Jim, and a friend spent the day near Clear Lake. On the way home, they ran out of gas. The friend got a ride and went for gas. Tired of waiting for him, Dwayne and Jim hitchhiked back to Yuba City, and walked to Dwayne's sister's house to get a ride home. While they were there, defendant arrived. Eventually, Dwayne, Jim, and defendant got a ride to the house defendant shared with the victim, Robert Lee. Defendant told Dwayne and Jim he would give them a ride home in Robert's van.

Robert, a large man weighing over 200 pounds, was drunk and refused to give defendant the keys to his van; he was angry because defendant had brought people home with him. Defendant, Dwayne, and Jim then went outside; defendant said he would talk to Robert. Robert still refused to give defendant his keys, but agreed Dwayne and Jim could spend the night on the porch. Defendant told them he would get Robert's keys when Robert passed out. Defendant then left Dwayne and Jim on the porch and went inside.

Dwayne and Jim heard defendant and Robert arguing. They heard Robert say, "No, Ray, no" or "Don't." They then heard thumping sounds inside the house.

At this point their stories differ somewhat. Jim testified defendant came outside looking panicked and said, "I think I killed him. But I didn't mean to." He seemed sincere. Defendant then handed Dwayne a two-by-four and told him to hit Robert if he moved. At this time the two-by-four was intact and had no blood on it. Dwayne had the two-by-four approximately forty minutes; later it was broken and had blood on it. Jim also saw a bent golf club.

Dwayne testified they entered the house to find Robert face down on the couch and defendant standing with a broken golf club in his hand. Dwayne

did not remember defendant saying he did not mean to kill Robert; instead he testified defendant said, "I killed the son of a bitch." He further testified he had the two-by-four only a few minutes, and it was already broken; he did not use the two-by-four.

A broken head of the golf club and a broken two-by-four were found by the police and admitted into evidence at trial.

The men tied Robert up with electrical cord and put him in the van. They also loaded the van with Robert's stereo, televisions, some silver and other items to sell.

Jim had the idea to dispose of the body near the Sutter bypass. They tied Robert's feet to a lawnmower they found there and kicked him into the water. The trio then went to Reno, where they sold most of the items in the van. Jim and Dwayne wiped the van to remove fingerprints.

After a few days gambling and drinking in Reno, Jim and Dwayne returned home. After one night at home they went to stay with a friend in Marysville, where they were arrested. Defendant was arrested in early June in Missouri.

The first story Jim and Dwayne told the police was one Dwayne concocted and largely exculpated them from any part of the murder. The defense used tapes of their prior statements and their prior felony convictions to impeach them. Davina Corbin, Dwayne's and defendant's sister, testified Dwayne was a habitual liar. Jim and Dwayne were cellmates prior to trial for four to five months.

The prosecution based its case on Jim Pair's testimony, not Dwayne's, arguing the jury could return a guilty verdict only if it believed Jim. The district attorney argued Dwayne's testimony should be considered only to corroborate parts of Jim's.

DISCUSSION

I*

---

* See footnote, *ante,* page 470.

## II

At the conclusion of the prosecution's case-in-chief, defense counsel moved pursuant to section 1118.1 for the court to instruct the jury only on voluntary manslaughter. Defense counsel argued that since there was evidence of a sudden quarrel immediately before the thumps were heard, the most that could be shown was voluntary manslaughter. He noted testimony that defendant said he did not intend to kill Robert negated even this offense. The court asked whether defendant's repeated solicitations for the keys to Robert's van could support a finding that the situation had been building up over time and therefore was not the result of a sudden quarrel. The district attorney argued there was evidence to go to the jury on the murder charge. The court agreed and denied the motion.

The prosecutor requested instructions on first degree murder, second degree murder, and voluntary manslaughter, all of which were given. The court asked, "Now, do we have an involuntary manslaughter?" The prosecutor said he did not offer the instruction and defense counsel concurred with the court that involuntary manslaughter was not involved.

Defendant contends the court erred in failing to instruct sua sponte on involuntary manslaughter. In *People* v. *Sedeno* (1974) 10 Cal.3d 703, at page 716 [112 Cal.Rptr. 1, 518 P.2d 913], the court held, "the duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." In *People* v. *Wickersham* (1982) 32 Cal.3d 307, at page 326 [185 Cal.Rptr. 436, 650 P.2d 311], the California Supreme Court adopted this standard for the court's duty to instruct on lesser-included offenses.

In closing argument defense counsel stressed the weakness of the prosecution's case; he called it a "lousy case." He argued there was no evidence to connect defendant to the killing except the testimony of two ex-felons who had made deals that resulted in their receiving only probation. He claimed if Jim Pair was a believable witness, to remember he testified defendant said he did not mean to kill Robert Lee, which negated an intent to kill. By this argument, the defense suggested that if the jury found defendant guilty of homicide, it could only be an unintentional form of homicide. The crux of the defense, though, was that defendant did not kill Robert, Dwayne did. Defendant was not directly relying on the partial defense of involuntary manslaughter, but urging an acquittal. However, counsel did argue that the evidence negated an intent to kill and that defendant and Robert got along well and there was no animosity between

them, which could support a finding of no malice. Although it does not appear defendant relied on involuntary manslaughter, it was not completely inconsistent with his defense. Therefore, the instruction should have been given if there was substantial evidence to support a guilty verdict of involuntary manslaughter.

In determining whether there was sufficient evidence to support a verdict of involuntary manslaughter, we begin with the definition of such offense. "Manslaughter is the unlawful killing of a human being without malice. It is of three kinds: . . . [¶] (b) Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . ." (§ 192, subd. (b).) In order to require a sua sponte instruction on involuntary manslaughter there must be sufficient evidence of an unlawful act that was not a felony or a lawful act committed in an unlawful or criminally negligent manner.

Although Robert received several blows to the head with sufficient force to break a two-by-four, a golf club, and his skull, there was conflicting testimony as to who inflicted the blows and when. Jim testified that the golf club was only bent, not broken, and the two-by-four was intact with no blood on it when Jim and Dwayne entered the house after defendant struck Robert. Further, Jim testified Dwayne was guarding the body with the two-by-four for forty minutes, which gave Dwayne sufficient time to inflict the massive wounds on the victim. Viewing the evidence most favorably to defendant, at the very least defendant struck Robert with a golf club, with sufficient force to bend it.

First, we determine whether defendant's act in striking Robert was lawful. Although violent acts have been held to constitute lawful acts committed unlawfully or with criminal negligence, and thus to come within the scope of involuntary manslaughter, where the defendant had an unreasonable belief in the need for self-defense (see *People* v. *Clark* (1982) 130 Cal.App.3d 371 [181 Cal.Rptr. 682]), there was no evidence here to suggest defendant acted in self-defense. Nor was there any evidence defendant's act was the result of criminal negligence. The evidence of several "thumps" after Robert cried out for defendant to stop manifested an intentional act of striking. Without a showing of justification, defendant's violent attack on Robert Lee was clearly unlawful.

Next we must determine whether the attack was an unlawful act not amounting to a felony. A severe blow with a golf club with force sufficient to bend it is without doubt an assault with a deadly weapon or assault by means likely to produce great bodily injury, or both. (§ 245, subd. (a)(1).)

Since such an assault is a felony,[2] the act does not fall within this definition of involuntary manslaughter.

We recognize that in certain circumstances a killing that occurs in the commission of a felony can be involuntary manslaughter, but only when the felony is not inherently dangerous. (*People* v. *Burroughs* (1984) 35 Cal.3d 824, 835 [201 Cal.Rptr. 319, 678 P.2d 894]; *People* v. *Morales* (1975) 49 Cal.App.3d 134, 144 [122 Cal.Rptr. 157].) That rule does not apply here since assault with a deadly weapon is inherently dangerous due to the nature of the weapon or the degree of force.

This killing during the commission of a dangerous felony provides no evidence of an act within the statutory definition of involuntary manslaughter.[3] Accordingly, the failure to instruct on involuntary manslaughter was not error.

### III*

. . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Carr, Acting P. J., and Davis, J., concurred.

---

[2] Assault with a deadly weapon may be punished either as a felony or a misdemeanor. (§ 245, subd. (a)(1).) However, the act becomes a misdemeanor only by the sentence imposed and remains a felony for all purposes up to imposition of sentence. (§ 17; *Barker* v. *California-Western States Life Ins. Co.* (1967) 252 Cal.App.2d 768, 772 [61 Cal.Rptr. 595].)

[3] It does appear there could be an unjustified killing that does not fit within any of the statutory definitions of criminal homicide where one kills unintentionally and without malice as the result of an inherently dangerous felony. The absence of malice would preclude the finding of murder. (§ 187, subd. (a).) Second degree felony murder cannot be used when the felony "is an integral part of the homicide" and the evidence shows the felony to be included in fact in the offense charged. (*People* v. *Ireland* (1969) 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) The lack of intent eliminates voluntary manslaughter. (*People* v. *Coad* (1986) 181 Cal.App.3d 1094, 1106 [226 Cal.Rptr. 386].) And because the killing was caused by an inherently dangerous felony, the elements of involuntary manslaughter are not met.

*See footnote, *ante,* page 470.