[No. C011856. Third Dist. Nov. 29, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
TAMMY ANN CAMERON, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*See footnote 1, *post*, page 594.

592

## COUNSEL

Cliff Gardner and Richard L. Phillips, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Jane N. Kirkland, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—Defendant was convicted by a jury of murder of the second degree and found to have used a deadly weapon in the commission of the offense. The trial court struck the enhancement and imposed the term prescribed by law. Defendant's salient contention on appeal is that the trial court prejudicially erred in giving an instruction which implied that voluntary intoxication has no bearing on the offense of murder in the second degree with implied malice.

In the published portion of the opinion[1] we conclude that the contention has merit. We will modify the judgment to conviction of involuntary manslaughter, the lowest offense of which the defendant would have been convicted but for the error, reinstate an enhancement which had been stricken, and give the People the option of retrial.

### FACTS AND PROCEDURAL BACKGROUND

Early in the morning of November 4, 1990, defendant stabbed Harold Moe in the leg. Moe bled to death soon thereafter.

On the evening of November 3, Paula Taylor-Costa (who testified under a grant of immunity) and defendant went in a limousine to a bar with some men. Both women were drinking alcoholic beverages and Taylor-Costa testified that defendant was drunk. Defendant testified she had drunk a glass

---

[1]The Reporter of Decisions is directed to publish the opinion except for parts III through VIII of the Discussion.

of champagne and two and one-half beers and that she was feeling "tipsy" but was not drunk. She also testified that she was "sobering up" late in the evening prior to leaving the bar.

Taylor-Costa testified that sometime during the evening she and defendant had a conversation with a man named Joe and agreed to meet at midnight with Joe and his roommate John Halen at their house. Taylor-Costa had spoken to Halen about meeting him around midnight and he had agreed. Defendant and Taylor-Costa departed for that location about 11:30 p.m. They obtained a ride from two strangers.

When defendant and Taylor-Costa arrived at Halen's residence they walked straight in. Jessica McNeil and Laura Kling were standing behind the kitchen counter. McNeil and Kling testified that Taylor-Costa and defendant walked directly upstairs and came back down less than five minutes later. Taylor-Costa introduced herself and asked if Kling was Halen's girlfriend. Kling affirmed this. Taylor-Costa announced that she loved Halen, had almost married him, and that she had a black Corvette. Her manner was rude, "snotty," and she appeared to be attempting to provoke Kling. Defendant did not participate in the conversation.

Halen and Moe, who was McNeil's boyfriend, had been outside; they entered the room. The situation was "uncomfortable," Halen and Taylor-Costa spoke with each other. Taylor-Costa said she and defendant were "going to leave now." But Halen suggested that Taylor-Costa go upstairs with him to talk. She, Halen, and defendant went upstairs. Kling was angry; McNeil thought Halen was rude and should have allowed Taylor-Costa and defendant to leave.

Halen, Moe, Kling, and McNeil had been drinking alcoholic beverages during the evening. They had all been in a good mood. Moe was under the influence of the alcohol; his posthumous blood-alcohol level was .16, indicating consumption of approximately 7.6 ounces of vodka. Moe talked with Kling and McNeil about their desire that Taylor-Costa and defendant leave when Halen went upstairs with them. Moe's mood changed a little bit during this conversation; he was annoyed by the disruption caused by Taylor-Costa and defendant.

When Halen and Taylor-Costa went upstairs, after a couple of minutes of conversation, they began "kissing and all that." (Taylor-Costa recognized that she had placed defendant in a difficult situation, however, she was drunk and "pretty preoccupied.") Defendant was uncomfortable observing the foreplay and went downstairs.

When she rejoined the others Moe told her she should "get out." Moe and defendant quarreled loudly. Kling gave the following account of the dialogue. "He would call her a bitch, and she would say fuck you, and he would call her a whore. And she would say don't mess with me." Kling said defendant repeatedly warned Moe not to "mess with" her, referring to him as "little boy." Defendant was 29 years old; Moe was 18 years old.

McNeil seconded Kling's account. McNeil testified that Moe then called defendant "something that stung" and defendant slapped him across the face. Moe slapped her back; McNeil told the police in her initial statement that Moe hit defendant back about "four times as hard as she hit him." At trial McNeil testified that she did not think his slap was harder, rather it was only louder because of the way that it hit. Kling testified defendant's slap was hard and Moe's equally hard. She said defendant grabbed her face and looked shocked, surprised, and angry that Moe had slapped her back. Kling and McNeil testified that McNeil stepped between the defendant and Moe and told Moe he "shouldn't hit girls." Defendant went back upstairs.

Defendant's testimony about this portion of the incident is dissimilar in the following respects. Moe hit her back significantly harder than she hit him. She fell back a couple of steps and Moe advanced and slapped her a second time. She then ran up the stairs.

Moe was 5 feet 10 inches tall and weighed 150 pounds. Defendant is five feet one inch tall and weighed about one hundred pounds.

When defendant arrived upstairs she knocked down a door that Halen had propped up and found Taylor-Costa and Halen lying on the floor preparing for copulation. Taylor-Costa testified that defendant was crying and was very upset. Defendant also appeared very angry. Defendant told Taylor-Costa that "they" were humiliating her and harassing her. Taylor-Costa testified she was preoccupied with the desire to copulate and "like I didn't really want to hear her."

Defendant dumped the contents of her purse on the floor and took up a folding knife containing a single-edged blade measuring three and one-half inches in length. Taylor-Costa testified that defendant remarked, " 'I'm not going to take this anymore. They don't know who they are fucking with. I'm going to stick the little mother fucker. I'm going to stick him.' " Taylor-Costa also testified that defendant also expressed in some manner that she was scared, afraid.

Defendant testified: "From what I can recall, as I was walking down the stairs, I said if I can't get out I was going to stick him." She also testified

that as she was coming down the stairs she heard Moe say "something about they were going to kick my ass, and that I deserved everything I was going to get." Kling and McNeil denied that Moe threatened to "beat up" defendant at any point in the evening.

Kling gave the following account of the events after defendant returned downstairs. Defendant walked up to Moe with the knife in her right hand and the quarrel resumed. She reiterated her earlier remarks about not "messing" with her and told Moe her boyfriend was going to "kick his ass." He replied by yelling at her to "get the fuck out of here" and continuing to call her "names." Moe pushed the defendant with both hands "up against the shoulders like a shove." She stepped or stumbled back a few steps. They were still arguing. Defendant said: "Don't fuck with me, little boy. I'll kill you." On cross-examination Kling testified defendant said: "Don't touch me or I'll kill you." Defendant and Moe reached the threshold of Halen's house. Defendant was outside, on a step lower than Moe. They continued to yell at each other—defendant reached out and stabbed him.

McNeil's account is similar, however, she saw Moe push defendant twice, the second time he pushed her out the door, and defendant's conditional threat to kill Moe followed the first shove by Moe. At this point defendant announced that she had a knife and Moe heard her say this. From the point where Moe first pushed defendant, everything seemed to happen "very fast."

Defendant testified about the last stage of the incident as follows. When she came back downstairs she was walking toward the threshold to leave and Moe approached her. He, Kling and McNeil were all calling her vulgar names. Defendant told Moe she had a knife and all that she wanted to do was leave. He replied sarcastically, "I'm scared." Moe shoved her and she fell back a few steps. She warned him again about the knife, adding a vulgar epithet, and said she wanted out. He came at her again, trying to slap or hit her, she raised her left arm to protect her face, she was going toward the door, trying to get away from him. They were fighting. He pushed her again and she fell down. She jumped back up and, "the stabbing occurred." She did not intend to stab Moe. The knife was only to scare him so she could leave. She did not remember stabbing him.

The prosecution's forensic pathologist testified as follows. There were two stab wounds on Moe's body. One was a two-inch deep wound in the left side in the abdominal region, the flank wound. This wound was essentially horizontal and straight from the front of the body towards the back. The most likely scenario for the delivery of this wound is that the assailant and Moe were face to face and the assailant plunged the knife in directly from front to back. The flank wound was not life threatening.

The other wound was a four-and-one-quarter-inch-deep wound in the left leg slightly below the groin area, the thigh wound. This wound was also in a horizontal plane but moved sharply upward. It partially punctured and severed the femoral artery and vein, the major blood supply and return of the left leg. This wound caused Moe's death due to blood loss. There was also a bruise likely caused by the knife hand of the assailant between the wound and the scrotum. The blow would have to have been delivered with significant force to account for the depth exceeding the length of the knife blade. The wound was inconsistent with Moe having stepped forward into a knife that was being held out.

After the stabbing Moe grabbed his leg, began yelling for Halen, and retreated from the doorway—soon his leg was covered with blood. Halen and Taylor-Costa came downstairs. Taylor-Costa went out the front door. She testified as follows. Defendant was standing on the grass near the porch, shaking, upset and crying. There was a female person in a window by the doorway who asked if she should call 911. Taylor-Costa told her not to do that. Then she and defendant took off running.

Davida Cory, Halen's next door neighbor, testified as follows. She heard someone screaming to "call 911." She went to the window overlooking Halen's doorway, four to six feet away. She saw a man standing in the doorway, she heard a woman angrily threaten him, saying watch out "little boy," or "little man," and then she saw the woman jab a knife into his leg. She kept hearing "call 911" and she responded by asking, "call 911?" The woman she had seen making the stabbing motion said "Don't call 911," and laughed. She thought the matter was a joke and started to close the window, but then Moe's hand came up to the window and it was drenched in blood. She went outside to assist him. The woman she saw do the stabbing was standing nearby. Another woman was standing further away, by a neighbor's house. The stabber looked at her for a moment and then both women darted off.

After the stabbing Taylor-Costa and defendant hitchhiked to a bar. They then went to a convenience store to use the telephone. There, at Taylor-Costa's suggestion, she and defendant washed the blood off of defendant's knife. They then hitchhiked to defendant's home. When they arrived defendant spoke with her brother for half an hour and then went to sleep. (He testified that she told him that the person she stabbed had been trying to rape her.) The next morning Taylor-Costa spoke to her father on the telephone and he informed her that Moe had died. Later that morning defendant telephoned the police and made arrangements to surrender herself for questioning. She was questioned early that afternoon.

Defendant's testimony about the incident was impeached by inconsistent statements made to the police during that interrogation. Most prominently, she told the police that she did not take her knife out until she was downstairs in the living room.

## DISCUSSION

### I

Defendant contends that the trial court committed reversible error in giving the following instruction, adapted from former CALJIC No. 4.20, to which she objected in the trial court.[2]

"The offense of murder in the second degree with implied malice and the lesser included offense of involuntary manslaughter are general intent crimes. In regard to general intent crimes, the law provides that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of her having been in such condition. The fact that the defendant was voluntarily intoxicated is not a defense to a general intent offense and does not relieve her of responsibility for the crime."

The Attorney General contends that this is a correct statement of the law, that other instructions erased the suggestion that voluntary intoxication could not negate implied malice, and, if the instruction induced confusion about the role of voluntary intoxication, it was harmless because voluntary intoxication was not the principal defense and the evidence shows that defendant's mental state was relatively unimpaired by alcohol. The defendant's contention of error is meritorious.

Voluntary intoxication is material to a finding of implied malice where that is an element of second degree murder. (*People* v. *Whitfield* (1994) 7 Cal.4th 437, 450-451 [27 Cal.Rptr.2d 858, 868 P.2d 272].) Second degree murder with implied malice is a "specific intent crime," as that term

---

[2]At the time of trial the use note to former CALJIC No. 4.20 said that the instruction should not be given where "the crime charged requires a specific intent or a particular purpose of [*sic*] motive."

A more aptly phrased caution was provided under the use note to the related former CALJIC No. 4.21, which also was given in this case: "This instruction, not CALJIC 4.20, should be given if there is evidence of intoxication and the crime charged requires specific intent or some mental state other than general intent."

The Use Note for the present version of CALJIC No. 4.20 (1992 rev.) cautions that "[i]f the trial includes crimes requiring both general and specific intent, or a particular mental state, use CALJIC 4.21.1." CALJIC No. 4.21.1 (1992 rev.) contrasts specific intent crimes with general intent crimes by noting that voluntary intoxication can be considered regarding the former.

is used in Penal Code section 22, subdivision (b).[3] (7 Cal.4th 437, 450-451.) Implied malice requires knowledge that the defendant's conduct endangers the life of another coupled with circumstances manifesting a conscious disregard for life. (*Ibid.*) This is a subjective standard. (*People* v. *Watson* (1981) 30 Cal.3d 290, 296-297 [179 Cal.Rptr. 43, 637 P.2d 279].)

■ The challenged instruction is misleading because it implies that the jury should disregard the evidence of voluntary intoxication for purposes of determining whether the defendant acted with actual knowledge of life endangerment and conscious disregard for life. The trial court erred in giving it.

The Attorney General suggests that the error is harmless because the trial court also correctly instructed the jury that voluntary intoxication could negate implied malice, "quickly erasing" the contrary implication of the erroneous instruction to the contrary.[4] However, giving such a "hopelessly conflicting instruction[]," indicating that the jury should consider the state of the defendant's intoxication in determining the existence of such a mental state, does not cure the error of a contradictory instruction given immediately thereafter as happened here. (See *People* v. *Hood* (1969) 1 Cal.3d 444, 451-452, esp. fn. 3 [82 Cal.Rptr. 618, 462 P.2d 370].) A bare contradiction creates confusion or unintelligibility and the sequence and complexity of the instructions does not suggest that the correct instruction would have overcome the incorrect instruction. Moreover, the jury, in the course of its deliberations, requested clarification of the meaning of the provision of the implied malice instruction which explains the requirement for subjective appreciation of the risk of death.

---

[3]Penal Code section 22 provides, in pertinent part:

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

[4]Immediately before the incorrect instruction the trial court gave the following instruction, adapted from former CALJIC No. 4.21:

"Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, knowing that it is capable of an intoxicating effect or when she willingly assumes the risk of that effect. [¶] Voluntary intoxication includes the voluntary ingestion of any intoxicating liquor. [¶] In the crimes of murder in the first degree and murder of the second degree, either express or implied, a necessary element is the existence in the mind of the defendant of a mental state of malice aforethought. [¶] In the crimes of murder in the first degree and murder in the second degree with express malice, a necessary element is the existence in the mind of the defendant of a specific intent to kill. [¶] In the lesser included offense of voluntary manslaughter, a necessary element is the existence in the mind of the defendant of a specific intent to kill. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether defendant had such specific intent or mental state. [¶] If from all the evidence you have a reasonable doubt whether defendant formed such specific intent or mental state, you must find that she did not have such specific intent or mental state."

The Attorney General further argues that the error is harmless because voluntary intoxication was not the primary defense in this case. He suggests that because self-defense, heat of passion, and imperfect self-defense were tendered and more prominently featured by the defense it is unlikely that the error determined the outcome of the case. Assuming for the sake of discussion that the argument is otherwise persuasive, it rests on a mistaken premise. It presupposes that the error has no bearing on the other theories of partial defense listed by the Attorney General.

■ As to the partial defense that defendant lacked the intent to kill and the act occurred in the heat of passion, evidence of intoxication is cognizable. The defense requires provocation capable of arousing sufficient passion and evidence that "the defendant in fact did act under it." (See, e.g., *People v. Logan* (1917) 175 Cal. 45, 49-50 [164 P. 1121].) Intoxication is a circumstance from which the jury might find that defendant's act in response to the provocation should be attributed to passion rather than judgment.

Similarly, evidence of intoxication could be material to the defense of unintentional killing in the course of "imperfect self-defense."[5] Proof of intoxication tends to support a claim of honest but mistaken belief in an imminent aggravated assault, providing a reason to account for the defendant's objectively unreasonable belief.

■ The Attorney General also claims that the error was harmless because there is "very little likelihood that the jury would have negated an implied malice finding because of voluntary intoxication." The Attorney General submits that it is unlikely the jury would have found that voluntary intoxication afforded a basis for reasonable doubt concerning implied malice because the evidence of defendant's behavior showed that she was relatively unimpaired by alcohol intoxication, noting her perception of the awkwardness of the contretemps presented by Taylor-Costa's behavior, her precon-frontation preparation to use the knife, her lack of difficulty in ambulation, and the great force of the blow she struck.

All of these considerations have a legitimate bearing on the presence or absence of a subjective appreciation of the risk that the knife blow to Moe's leg would endanger his life. However, the question of reasonable doubt is still for the jury to decide. The Attorney General again assumes that the instruction concerning voluntary intoxication only bears on the subjective appreciation of the risk of death arising from the defendant's act. But, as we

[5]The Supreme Court held in *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574] that the defense of imperfect self-defense continues despite the abolition of the defense of diminished capacity.

have shown, the misleading instruction could have been applied to other theories of partial defense.

This is not a garden-variety second degree murder conviction. We do not imply that the question whether the homicide was excusable or justifiable was closely balanced. Moe's intention, manifested in his words and his actions, was to remove the defendant from the residence. Even viewed in a light reasonably favorable to defendant, there is no strong claim that Moe's actions afforded a "reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished . . . ." (See Pen. Code, § 197.)[6] However, Moe, a significantly larger person, initiated the quarrel, demanded without legal right that defendant leave Halen's residence, and acted to enforce that demand by unlawfully using force, pushing and shoving her to remove her from the residence. Neither this conduct nor Moe's vulgar epithets excused or justified defendant in stabbing him and causing his tragic death. (Pen. Code, §§ 195, 197.) Nonetheless, the facts present genuine and serious questions whether defendant's offense was murder or manslaughter.

Assuming arguendo that the applicable standard of prejudice is governed by the California Constitution, in our opinion, after an examination of the entire cause, including the evidence, it is reasonably probable that a result more favorable to defendant would have been reached in the absence of this error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

II

■ The trial court prejudicially erred in instructing the jury on the effect of voluntary intoxication. That elicits a question of remedy, whether the error requires a reversal of the judgment of conviction, entitling the defendant to a retrial, or whether a lesser offense should be imposed subject to retrial at the option of the People. (Cf., e.g., *People* v. *Edwards* (1985) 39 Cal.3d 107, 118 [216 Cal.Rptr. 397, 702 P.2d 555]; *People* v. *Heffington* (1973) 32 Cal.App.3d 1, 14-17 [107 Cal.Rptr. 859].) The difficulty with the latter course stems from the opinion of this court in *People* v. *Rhodes* (1989) 215 Cal.App.3d 470 [263 Cal.Rptr. 603].■

---

[6]The only consideration to the contrary is defendant's self-serving testimony of a threat to "kick her ass" as she descended the staircase. Unsurprisingly, in light of the lack of verisimilitude and the numerous persuasive matters of impeachment, the jury rejected defendant's version of the incident in rejecting her claim of self-defense. The instructional error regarding voluntary intoxication has no bearing on perfect self-defense.

In *People* v. *Rhodes, supra,* 215 Cal.App.3d at page 476, footnote 3, we reasoned that, ". . . there could be an unjustified killing that does not fit within any of the statutory definitions of criminal homicide where one kills unintentionally and without malice as the result of an inherently dangerous felony." If this is so, we must reverse the conviction outright. Under the *Rhodes* logic, if the jury found there was an absence of malice and an absence of an intent to kill it would have had to *acquit* the defendant, even though she committed an unlawful killing of a human being. The jury would be similarly instructed on retrial—to acquit defendant if it finds no malice or intent to kill for any of the reasons assayed in our earlier discussion.

Faced with these absurd prospects we are constrained to conclude that the view of involuntary manslaughter taken in *Rhodes* is incorrect. (See *People* v. *Burroughs* (1984) 35 Cal.3d 824, 835-836 [201 Cal.Rptr. 319, 678 P.2d 894]; *People* v. *Morales* (1975) 49 Cal.App.3d 134, 144-145 [122 Cal.Rptr. 157].)

Penal Code section 192 in pertinent part provides:

"Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

"(a) Voluntary—upon a sudden quarrel or heat of passion;

"(b) Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection . . . .

"(c) Vehicular—."

*Rhodes* reasons that because Penal Code section 192 says that involuntary manslaughter is an unlawful killing " 'in the commission of an unlawful act, *not* amounting to felony,' " it does not encompass an unlawful homicide in the commission of a felony. (*People* v. *Rhodes,* 215 Cal.App.3d at pp. 475-476, italics added.) It cites to *Burroughs* and *Morales,* which found this reasoning *unpersuasive* as applied to "a noninherently dangerous felony . . . if the felony is committed 'without due caution and circumspection.' " (*People* v. *Burroughs, supra,* 35 Cal.3d at p. 835.)

*Rhodes* implicitly concludes that *Burroughs* and *Morales* carved out an exclusion only for a noninherently dangerous felony and that it "does not apply here since assault with a deadly weapon is inherently dangerous due to the nature of the weapon or the degree of force." (*People* v. *Rhodes, supra,*

215 Cal.App.3d at p. 476.) Upon reflection, and faced with the prospect of compelling a potentially avoidable retrial, we find the conclusion in *Rhodes* untenable.

When the manslaughter statute was first enacted in 1872, consisting of the present statute without subdivision (c), it defined a single crime. "Manslaughter is the unlawful killing of a human being, without malice." (Pen. Code of 1872, § 192.) The offense was categorized as either voluntary or involuntary. The crime of manslaughter complements the crime of murder. Thus, if a killing is unlawful it must constitute either a murder or manslaughter, the defining boundary being malice[7]; if the homicide is unlawful and malice is lacking the offense is manslaughter. If the offense cannot be voluntary manslaughter, because the case law holds that voluntary manslaughter requires an intent to kill,[8] it is manslaughter nonetheless and, a fortiori, must be involuntary manslaughter.

[7]The provisions regarding voluntary and involuntary manslaughter appear to be an abbreviated paraphrase of the restatement in the Penal Code of 1872 of the earlier common law doctrines of malice, absence of malice, and criminal liability for negligence likely to produce a killing, or in the commission of an unlawful act, that were contained in sections 22 through 25 of the Crimes and Punishment Act of 1850 (Stats. 1850, ch. 99, p. 231). (See code comrs. note foll. 1 Ann. Pen. Code, § 192 (1st ed. 1872, Haymond & Burch, comrs.-annotators) p. 85.)

In the period since the enactment of the 1872 Penal Code various doctrines in the law of murder, as they existed at common law, have been altered by case law. (See, e.g., *People v. Logan, supra,* 175 Cal. at p. 48, heat of passion can be provoked by insulting words alone.)

Some of these changes recently were repudiated in the abolition of the defense of diminished capacity. Others are not inextricably bound up in diminished capacity doctrine. For example, at common law any killing caused by the commission of a felony malum in se was murder. (See Perkins, *A Re-examination of Malice Aforethought* (1934) 43 Yale L.J. 537, 557-563; cf. § 25, Crimes and Punishment Act of 1850.) This is reflected in the statutory definition of involuntary manslaughter. (§ 192, subd. (b); see *People v. McIntyre* (1931) 213 Cal. 50, 56 [1 P.2d 443].) However, California case law has long imposed an additional requirement that the felony be one which inherently entails danger to life. (Compare *People v. Robillard* (1960) 55 Cal.2d 88, 98 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], with *People v. Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) *Burroughs* was required to overcome the ostensible statutory barrier to classifying a homicide in the commission of a felony as an involuntary manslaughter because of the semantic anomaly created by the case law development of the rule narrowing the reach of malice aforethought.

[8]This doctrine early on became deeply seated in the case law without thoughtful examination. It stems from the offhand misreading of *People v. Freel* (1874) 48 Cal. 436, which only holds, correctly, that even if there were an intent to kill the offense could be manslaughter under the heat of passion doctrine. (See, e.g., *Drown v. New Amsterdam Casualty Co.* (1917) 175 Cal. 21, 24 [165 P. 5]; *People v. Miller* (1931) 114 Cal.App. 293, 300-301 [299 P. 742]; 25 Cal.Jur.2d, Homicide, § 126, p. 635.) Thereafter the statement often appears without analysis or with a brief reference to the statute or earlier cases. (See, e.g., *People v. Bridgehouse* (1956) 47 Cal.2d 406, 413 [303 P.2d 1018]; *People v. Gorshen* (1959) 51 Cal.2d 716, 732-733 [336 P.2d 492], predicating intentionality on the statutory term "voluntary"; *People v. Forbs* (1965) 62 Cal.2d 847, 852 [44 Cal.Rptr. 753, 402 P.2d 825].)

This casual attitude toward reading the manslaughter statute may stem from the fact that the distinction was of little real significance in the criminal law until 1978, when different

*Rhodes* implicitly reads the description of involuntary manslaughter as an exclusive measure of the unlawful killings which can be treated as involuntary manslaughter. The rationale of *Burroughs* and *Morales* rejects that reasoning when it results in placing an unlawful homicide without malice outside the overarching *general* description of manslaughter. *Rhodes* is correct that the rule of *Burroughs* and *Morales*, i.e., the holding regarding killings in the course of a felony not subject to the modern second degree felony murder rule under the doctrine of *People* v. *Ford, supra,* 60 Cal.2d 772, 795, does not apply to a felony that is inherently dangerous to life. However, the rationale squarely applies if the jury may nonetheless determine under another doctrine of the law that the malice aforethought required for murder was absent. (See generally, *People* v. *Whitfield, supra,* 7 Cal.4th at p. 451.)

For these reasons, in the event the People elect not to retry the defendant, we will direct that the conviction of murder in the second degree be reduced to the least offense for which the defendant would have been convicted but for the error, involuntary manslaughter.

### III-VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The trial court prejudicially erred in instructing the jury on the effect of voluntary intoxication upon the issues of second degree murder under a theory of implied malice. The least offense of which the defendant would have been convicted but for the error is involuntary manslaughter. The judgment is reversed with directions that, if the People do not bring defendant to trial within 60 days after the filing of the remittitur in the trial court pursuant to Penal Code section 1382, subdivision (2), the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of involuntary manslaughter and reinstatement of the stricken finding that defendant used a deadly weapon in the commission of that offense and shall resentence defendant accordingly. (See *People* v. *Edwards* (1985) 39 Cal.3d 107, 118 [216 Cal.Rptr. 397, 702 P.2d 555].)

Raye, J., concurred.

penalties for the two kinds of manslaughter were first enacted. (Stats. 1978, ch. 579, p. 1980.) This well-entrenched doctrine is analytically unfortunate, for an unlawful killing that results from a voluntary battery using force likely to cause great bodily harm but without malice is more sensibly classified, for purposes of culpability, as voluntary manslaughter, regardless of the absence of intent to kill.

*See footnote 1, *ante*, page 594.

**DAVIS, J.**—I concur.

"I do not rule Russia; ten thousand clerks do." (Nicholas I (1796-1855).)

My colleague has done an admirable job exposing the flaws in the published version of *People* v. *Rhodes* (1989) 215 Cal.App.3d 470 [263 Cal.Rptr. 603]. As one of the participating justices in *Rhodes*, it is only fitting that I assume the burden of recounting how the published version of *Rhodes* has miraculously created a life for itself despite this court's best efforts to put a stake through its heart.

While it is unfortunately true that my two former colleagues and I initially filed the published version of *Rhodes*, all three of us recognized the error of our ways, granted Mr. Rhodes a rehearing, and issued a new, nonpublished opinion that in no way adopted the language we take issue with today. (*People* v. *Rhodes* (Feb. 28, 1990) C004019.) In such circumstances the publisher is normally notified of the court action and the superseded opinion which was initially designated for publication is never published in the official reports.

Alas, while we wearers of the robe had a great deal of authority (in contrast to power) over the matter of publication, it was our normally faultless clerical staff that had the final word regarding whether *Rhodes* would be published and what version it would appear in. Thus *Rhodes* has the distinction of being the only published opinion I am aware of that not only rightly receives no respect from other appellate courts, but also is saddled with the indignity of having no significance to the parties themselves. May it now rest in peace.