**KENMORE BOSTON, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

**BOSTON v. GOVERNMENT OF THE VIRGIN ISLANDS**

D.C. Crim. App. No. 2003/0019

District Court of the Virgin Islands

Division of St. Croix

February 24, 2005

*For Appellant*: DEBRA S. WATLINGTON, ESQ., Territorial Public Defender, St. Thomas, U.S. Virgin Islands

*For Appellee*: MAUREEN PHELAN, ESQ., V.I. Department of Justice, St. Thomas, U.S. Virgin Islands

FINCH, *Chief Judge, District Court of the Virgin Islands*; MOORE,[1] *Judge of the District Court of the Virgin Islands*; and SWAN, *Judge of the Territorial Court, Division of St. Thomas and St. John, Sitting by Designation*

---

[1] Judge Moore retired on January 3, 2005.

**MEMORANDUM OPINION**

(February 24, 2005)

Appellant Kenmore Boston was charged in a Superceding Information with murder in the first degree. The matter proceeded to trial. After the evidence was presented, the jury was instructed on the offenses of murder in the first degree, murder in the second degree, and voluntary manslaughter. The jury found Boston guilty of voluntary manslaughter.

Boston appeals his conviction, asserting that the evidence was insufficient for the jury to find him guilty of voluntary manslaughter. He also maintains that the trial court erred by not instructing the jury on the charge of involuntary manslaughter.

The Government contends that because Boston requested an instruction on voluntary manslaughter, he cannot claim that there was insufficient evidence to support a verdict of guilty on such offense. The Government further asserts that there is sufficient evidence to support the jury's guilty verdict on the voluntary manslaughter charge. Regarding an involuntary manslaughter instruction, the Government argues that Boston did not preserve his objection to the trial court's decision not to instruct on involuntary manslaughter. The Government further insists that the trial court did not err in not giving such instruction.

This Court has jurisdiction to review judgments and orders of the Territorial Court in criminal cases where the defendant has been convicted other than through a guilty plea. 4 V.I.C. § 33; Section 23A of the Revised Organic Act of 1954.[2]

### I. Summary of the Evidence

The evidence showed that the victim, Chamonie Miller, was Boston's girlfriend, and that Miller and Boston had a four year-old child together. Miller's mother believed them to have a very good relationship. Miller's mother stated that Boston had an excellent relationship with his child and Miller's other two children.

Boston would frequently wait for Miller in the parking lot of the casino where she worked. One night, while waiting in the parking lot, he

---

[2] *See* Revised Organic Act of 1954 § 23A, 48 U.S.C. § 1613a. The complete Revised Organic Act is found at 48 U.S.C. §§ 1541-1645 (1995 & Supp. 2001), reprinted in V.I. CODE ANN., 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp. 2001) (preceding V.I. CODE ANN. tit. 1).

asked one of Miller's co-workers whether Miller may have been seeing someone else. Boston, himself, was in a romantic relationship with another woman.

On August 4, 2002, Miller departed early from her job. She gave a co-worker and the co-worker's boyfriend a ride to her co-worker's home and visited for awhile with them at her co-worker's home. She was jovial and in good spirits. From her co-worker's home, Miller went to Two Plus Two, a dance club and restaurant. While at Two Plus Two, she received a call from Boston on her cellular phone. She immediately rushed to her vehicle without retrieving any food from Two Plus Two. Shortly thereafter, Miller arrived at the yard of one of Boston's friends where Boston had been drinking with some friends for a few hours. Several neighbors testified that they heard screams and a horn honking that seemed to be emanating from a vehicle resembling Miller's that was in Boston's friend's yard. Subsequently, the neighbors saw the same vehicle leaving the area.

Miller's mother began looking for her the next day. A few nights later, while time records indicated that Boston was at his workplace, Boston was observed with another man pushing a vehicle into the water. There was testimony that Boston could have left his job site by passing under a fence without anyone missing him during his shift.

Miller's body was found in the submerged vehicle. Experts established that her body had decomposed in the air for some time before entering the water. Despite the level of decomposition, experts also determined that she had received a blow to the right frontal area of her head that had not fractured her skull. She also had several minor lacerations on the left side of her face.

However, the experts differed as to the cause of death. The Government's expert testified that the cause of death was a blunt force trauma to the head. The defense expert contended that the Government's investigation was inconclusive because x-rays were not taken, the cranial cavity was not opened, and no toxicology studies were conducted. The defense expert doubted the Government's determination of the cause of death:

Q. What is your opinion as to his conclusion of blunt trauma to the body?
A. Certification of death is mentioned about blunt force and head trauma. There is a possibility that they used blunt force trauma, but

the mere fact we are seeing some other appearances of the lacerations, that is fine, but we don't know the extent, how deep are these? How large are these? Whether is it because of decomposition or animal activity, or they have been like that, and that is why it is inconclusive that these lacerations resulting from blunt trauma to the head cause the death of the individual and that is my opinion.

Q. Now, doctor, as to the lacerations what other factors, maybe I missed it, what other factors could have caused those lacerations to the body?

A. Lacerations are caused as a result of a blunt force acting on the bone. So that tissue, soft tissue between the bone and blunt force splits and you make a laceration, but the laceration which was there in the beginning is grossly altered resulting from decomposite and animal activity, so this was the position when the person die we don't know that. We are speculating this six centimeter. Was it like this right from the beginning No, we can't say that.

We know we can say that there is gross distortion of the entire appearance and that is the only thing. Again, it may be a blunt force trauma, but because of the distortion, decomposition, it is very difficult to say positively with certainty.

Joint App., at 374-16.

According to the defense expert, the lack of any fractures made it difficult to tell whether the blunt force trauma was sufficiently severe to cause death.

A. I would say that the manner of the forces undetermined, I don't know, and the cause of death I would say probably, unknown, and then I will give explanation there are certain injuries noted on the forehead and the face, but again remember that the bones of the jaw they were not fractured. It's not you have a machete, hit, you get a fracture there. It was not there. So in my opinion, I would have left it as unknown undetermined.

Q. Why is it important the jaw was not fractured?

A. The reason is that the injury or the force that was applied to the jaw was not of severity to the extent that it could produce fractures of the jaw or the maxillary bone or the forrid [sic], so it striking your head again the interior part of the body. That is a possibility because the forces are not enough to produce any fractures there.

525

The ribs are intact, so it's not a severe force. So taken all these factors cause of death, I don't know and the manner is not natural for sure, but undetermined.

Joint App., at 3 77-78.

## II. Voluntary Manslaughter

### A. Whether Appellant is Estopped from Challenging Sufficiency of the Evidence by Requesting Voluntary Manslaughter Instruction?

Boston requested that the jury be instructed on voluntary manslaughter, even though he was only charged with first degree murder. The Government argues that because Boston requested the voluntary manslaughter instruction, he is judicially estopped from arguing that there was insufficient evidence to support the jury's verdict that he was guilty of voluntary manslaughter.

Judicial estoppel is "[e]stoppel that prevents a party from contradicting previous declarations made during the same or a later proceeding if the change in position would adversely affect the proceeding or constitute a fraud on the court." BLACK'S LAW DICTIONARY 571 (7th Ed. 1999). It has also been termed the "doctrine of preclusion of inconsistent positions." *Id.* The Third Circuit considers judicial estoppel to be "an extraordinary-remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 365 (3d Cir. 1996) (quotation omitted).

The trial court acceded to Boston's request to instruct the jury on voluntary manslaughter which is a lesser included offense of first degree premeditated murder. *Virgin Islands v. Commissiong,* 706 F. Supp. 1172, 1188 n.4 (D.V.I. 1989). To decide to what extent, if any, an appellant is judicially estopped from challenging the sufficiency of the evidence by requesting an instruction on a lesser included offense, the Court considers the position that a defendant takes before a trial court by requesting such an instruction. A defendant requests an instruction on a lesser included offense generally for two reasons: First, the defendant believes that the evidence is insufficient for the jury to find guilt of the charged offense or a lesser included offense requested by the government. The defendant is concerned that rather than acquitting, the jury will find guilt of the greater offense even though each element has

not been proven beyond a reasonable doubt. Thus, the defendant in requesting the lesser included offense instruction represents to the court, not that there is sufficient evidence for the jury to find guilt of the lesser included offense, but that the evidence is insufficient for the jury to find guilt of the next higher offense charged or requested by the government.

The second reason for a defendant to request a lesser included offense is the anticipation that, even if the jury does find that there is sufficient evidence to find guilt of a greater offense, the jury will exercise its "pardon power" and find guilt of the lesser included offense. *See State v. Espinosa*, 686 So. 2d 1345, 1348 (Fla. 1996). Here again, by requesting the lesser included offense, the defendant is not representing that there is sufficient evidence to find guilt of the lesser included offense, but is inviting the jury to be lenient.

■Because the defendant, in requesting an instruction on a lesser included offense, is not taking the position before the court that there is sufficient evidence for the jury to find guilt of the lesser included offense, the defendant is not judicially estopped from making a sufficiency of the evidence challenge. Thus, Boston may challenge whether the jury had sufficient evidence before it to find him guilty of voluntary manslaughter, even though he had requested the instruction on voluntary manslaughter.

## B. Whether the Evidence was Sufficient for the Jury to Find Boston Guilty of Voluntary Manslaughter?

In considering Boston's sufficiency of the evidence challenge, the Court "must view the evidence in the light most favorable to the government and must sustain the jury's verdict if a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offense." *United States v. Syme*, 276 F.3d 131, 156 (3d Cir. 2002) (quotation omitted). "[O]nly when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Id.* (quotation omitted).

■The four essential elements of voluntary manslaughter in the Virgin Islands are:

> One, the defendant must have unlawfully killed another. Two, he must have done so without malice aforethought. Three, the killing

must have occurred upon a sudden quarrel or heat of passion. Four, the defendant must have had either an intent to kill or an intention to inflict serious or grievous bodily injury that would likely cause or result in the victim's death.

*Virgin Islands v. Knight*, 764 F. Supp. 1042, 26 V.I. 280, 290-91 (1991) (citations omitted).

■ There was sufficient evidence for the jury to find that Boston killed Miller. The cell phone records that were introduced tended to show that Boston called Miller on her cell phone and asked her to come to meet him at his friend's yard. From the neighbors' testimony that they had been awoken by screams and saw a vehicle that fit the description of Miller's vehicle in Boston's friend's yard, the jury could find that Miller came to meet Boston, that Boston and Miller had an altercation, and that Miller was afraid of Boston. Subsequently, an eyewitness observed Boston and another man pushing Miller's vehicle into the water. Although Boston presented evidence that he was at work during the period of time when he was seen pushing the vehicle into the water, that evidence was not corroborated and was brought into question by testimony that he could have left work unobserved. Miller was later found dead in her vehicle. The Government's expert testified that Miller died from a blunt force trauma to her head.

■ There was sufficient evidence to find that Boston killed Miller without malice aforethought. Malice aforethought "may ... be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences." *Virgin Islands v. Lake*, 362 F.2d 770, 774, 5 V.I. 594 (3d Cir. 1966). Malice is a state of mind that can only be inferred from the surrounding facts. *Id.*

Miller was Boston's girlfriend and the mother of his child. He was known to have a good relationship with her. Boston would often wait for Miller in the parking lot until she finished work. Miller drove to meet Boston after he called her; he did not stalk or chase her. Such circumstances do not show a depraved spirit. The jury could infer that Boston would not have called Miller on her cellular phone, asked her to meet him in a public place, and caused her to scream for help loudly if he was bent on evil mischief.

■ There was sufficient evidence for the jury to find that the killing occurred upon a sudden quarrel. Miller's mother indicated that Miller and Boston got along well. The evidence showed that Miller responded

to Boston's call by immediately leaving Two Plus Two. Despite their good relationship, there was testimony of impartial witnesses who heard screams for help from the vicinity of Boston's friend's yard, apparently emanating from a vehicle that looked like Miller's vehicle. From this the jury could reasonably infer that after Miller met Boston, they had a sudden quarrel.

█ Finally, there was sufficient evidence for the jury to find that Boston had an intention to inflict serious bodily injury on Miller that would likely result in her death. The experts agreed that Miller was struck in her head more than once. One area of her head showed a blunt force trauma. In addition to the blunt force trauma, there were lacerations, indicating that Miller was hit more than once. The jury could infer that since Boston struck Miller forcefully in the head, and hit her more than once, that he intended to inflict serious bodily injury on her that would likely result in her death.

Thus, evidence was presented to the jury sufficient to support the jury's verdict. Viewing the evidence in the light most favorable to the Government, the Court must sustain the jury's verdict. A reasonable jury believing the Government's evidence could find beyond a reasonable doubt that the Government proved the offense of voluntary manslaughter.

### III. Involuntary Manslaughter

### A. Whether Request for Involuntary Manslaughter Instruction Was Preserved?

Rule 30 of the Federal Rules of Criminal Procedure provides that:

> No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

The purpose of Rule 30 is to give the trial court an opportunity to correct any problems with the jury instructions before the jury begins to deliberate, to avoid a time-consuming new trial. *United States v. Russell*, 134 F.3d 171, 178 (3d Cir. 1998). Because there is no pertinent Territorial Court rule, Rule 30 governs with respect to whether Boston

preserved his request for an instruction on involuntary manslaughter. *See* TERR. CT. R. 7.

"[A] request for an instruction need only be sufficiently clear to enable the trial judge to fairly evaluate it." *United States v. Davis*, 183 F.3d 231, 252 (3d Cir. 1999). A party is not "required to adhere to any formalities of language and style to preserve his objection on the record." *Russell*, 134 F.3d at 178 (quotation omitted). "[T]he requirement that counsel make specific requests is not designed to be a trap." *Davis*, 183 F.3d at 252.

 Although a request for an instruction, without more, does not preserve an objection to the instruction actually given by the trial court, *Jones v. United States*, 527 U.S. 373, 387, 144 L. Ed. 2d 370, 119 S. Ct. 2090 (1999), a colloquy between counsel and the trial court may be "tantamount to an objection and therefore sufficient to preserve this issue" for review. *Russell*, 134 F.3d at 180. When a request for an instruction is made in the context of an "on-the-record meeting specifically to find out any objections or exceptions to the charge," the trial court is particularly likely to interpret such a request as an objection to the charge as given. *See Russell*, 134 F.3d at 179 (quotation omitted).

At the jury instruction conference, defense counsel requested an instruction on involuntary manslaughter.

> MR. WILLOCKS: ... I had a talk and I informed [my client] and he wishes to go with the two lesser included.
> THE COURT: Which two?
> MR. WILLOCKS: Voluntary and involuntary

Joint App., at 423.

The trial court responded:

> THE COURT: Is the commission of an—there is no culpable omission of some legal duty. There is no commission of the lawful act which might produce death and no circumstances that would find without due caution and the lesser included offense would be second degree murder if the jury fails to find—

*Id.* at 424-25. The trial court's response contains the court's reasons for not giving an involuntary manslaughter instruction, indicating that the trial court realized that Boston was seeking such an instruction.

Defense counsel understood from the trial court's response that his request was being denied, and took a different tack:

> MR. WILLOCKS: Your Honor, my client wishes for the, if not the involuntary, simply the murder one and the voluntary and not the murder two.
> THE COURT: No.

*Id.* at 425.

Defense counsel then stated that his client acquiesced in the trial court's ruling that a lesser included offense charge was warranted, but maintained an objection to the second degree murder charge.

> THE COURT: What is your client's position.
> MR. WILLOCKS: Upon discussion, he advised me he is willing for the lesser included dictated by the Court which would be murder second degree and the voluntary manslaughter. Defense would merely ask that the Court place on the record the defendant's choice so it can be stated for the record. Your Honor, if I may?
> THE COURT: Yes.
> MR. WILLOCKS: Your Honor, upon discussion with my client, he just ask the objection be made on the ruling of the Court the second degree murder has to be included just so that the record reflects.

*Id.*

The trial court placed its reasons for its decision regarding the jury charge on the record, addressing the rationale for not giving the involuntary manslaughter charge, in particular:

> THE COURT: ... I will not include the lesser included offense of involuntary because the circumstances of this case does not fit any of the circumstances which involuntary manslaughter can be committed. Under the statute involuntary manslaughter would be in the commission of an unlawful act not amount to felony. The facts of this case would indicate if, in fact, an assault took place that resulted in death, the assault would be a felony under our statute.
>
> The second circumstances and the culpable omission, there is no indication on that record any omission of a legal duty. I have it' a commission of an act which amounts to a felony.

531

And the third exception would be in the commission of a lawful act. The assault is not a lawful act although the act produce it is not the circumstances under which involuntary manslaughter can be ... .

*Id.* at 426-427.

Although defense counsel stated that Boston was only-continuing to object to the trial court giving the second degree murder charge, Boston never withdrew his request for an instruction on involuntary manslaughter. The trial court did not decline to charge on involuntary manslaughter based on any withdrawal of such request by Boston, but rather premised the decision on a legal interpretation of the crime of involuntary manslaughter.

█ This Court finds that the trial court understood that Boston was requesting an instruction on involuntary manslaughter and after careful consideration denied such request for reasons provided on the record. Boston was not required to take further exception to the trial court's ruling to preserve his objection. *See* FED. R. CRIM. P. 51 (providing that "[e]xceptions to rulings or orders of the court are unnecessary") To require more of Boston's defense counsel with respect to preserving the objection would be to place form over substance.

█ Thus, this Court finds that Boston did preserve his objection to the trial court's decision not to include the lesser included offense of involuntary manslaughter in the jury charge. Since Boston properly preserved this issue for appeal, the standard of review is harmless error, rather than plain error. *See Russell*, 134 F.3d at 178.

## B. Whether a Rational Jury Could Have Found that Boston Committed Involuntary Manslaughter?

Although the trial court decided not to give an involuntary manslaughter instruction based on an interpretation of the involuntary manslaughter statute, the Court need not consider the scope of the involuntary manslaughter statute to resolve this appeal.[3] Rather, the

---

[3] *Compare Virgin Islands v. Knight*, 989 F.2d 619, 632, 28 V.I. 249 (3d Cir. 1993) (holding that unlawful killing that occurs in commission of act amounting to a felony cannot be involuntary manslaughter) *with People v. Cameron*, 30 Cal. App. 4th 591, 36 Cal. Rptr.2d 656, 664 (1994) (reasoning that clauses defining involuntary manslaughter are not exclusive, but are enumeration of specific instances of killings absent malice aforethought), *People v. Morales*, 49 Cal. App. 3d 134, 122 Cal. Rptr. 157, 164 (1975)

Court, after reviewing the record submitted on appeal, finds that a rational jury could not have found Boston guilty of involuntary manslaughter, because there is no evidence that the killing was unintentional. "Involuntary manslaughter is an unintentional killing ... ." *Virgin Islands v. Knight*, 764 F. Supp. 1042, 1048, 26 V.I. 280 (1991).

Key evidence that links Boston with Miller is their cellular phone conversation and the arrival of a vehicle that looked like Miller's vehicle in Boston's, friend's yard shortly after the conversation. From the screams that the neighbors heard emanating from the vehicle that looked liked Miller's vehicle, the jury could not rationally find that the killing occurred accidentally.

█ From the nature of the injuries that Miller received, the jury could only reasonably conclude that the perpetrator intended to inflict serious bodily injury with an intent to kill her. Although Miller's body was severely decomposed when she was found, the experts were still able to conclude that Miller had been struck multiple times in the head. One of the blows was so severe that the Government's expert believed it to be the cause of her death. Because there was no evidence to show that the killing was unintentional, and involuntary manslaughter involves an unintentional killing, no rational jury could find Boston guilty of involuntary manslaughter. Therefore, the court did not err by refusing to instruct the jury on involuntary manslaughter.

## IV. CONCLUSION

Boston's requesting an instruction on voluntary manslaughter does not judicially estop him from challenging the sufficiency of the evidence to support the jury's verdict. Viewing the evidence in the light most favorable to the Government, there was sufficient evidence for the jury to find Boston guilty of voluntary manslaughter. Boston preserved his objection to the Court not instructing the jury on involuntary manslaughter.

Because no rational jury could find Boston guilty of involuntary manslaughter in that there was no evidence that the killing was unintentional, the court did not err in not instructing the jury on involuntary manslaughter. Thus, the Court affirms.

(same), *People v. Holtschlag*, 471 Mich. 1, 684 N.W.2d 730, 736 (2004) (same), and *State v. Greene*, 314 N.C. 649, 336 S.E.2d 87, 89 (1985) (same).