Filed 7/19/16 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JUAQUIN GARCIA SOTO,<br><br>     Defendant and Appellant. | H041615<br>(Monterey County<br>Super. Ct. No. SSC120180A)<br><br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING**<br><br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on June 30, 2016, be modified as follows:

1.  The text of Footnote 8 on page 19 is replaced with the following text:

> In a petition for rehearing, the Attorney General belatedly argues that the instruction should not have been given because defendant's belief in the need for self-defense was purely delusional. (See *Elmore, supra,* 59 Cal.4th at p. 960.) The record, however, contains substantial evidence from which reasonable jurors could have found that defendant's belief in the need for self-defense was not entirely delusional. For example, defendant's expert testified that sleep deprivation caused by methamphetamine use negatively affects users' ability to process information, form judgments, and make good decisions. That the trial court admitted this evidence and allowed defendant to raise a claim of imperfect self-defense constituted an implicit finding that substantial evidence supported the instruction notwithstanding the holding of *Elmore*.

2.  On page 22, the following footnote, numbered footnote 10, is appended to the last sentence of Section II.A., immediately preceding the heading for Section II.B.:

In her petition for rehearing, the Attorney General contends we sua sponte raised the issue of voluntary intoxication as it pertains to express malice. She argues that defendant limited his claim to voluntary intoxication as it applies to *implied* malice only. Defendant did not state his claim in so limited a fashion. Much of defendant's argument concerned malice generally without specifying implied or express malice, and he relied on case law pertaining to imperfect self-defense as it applies to express malice. (See appellant's opening brief at page 17, citing *Elmore*, *supra,* and *In re Christian S.*, *supra*.) Indeed, the Attorney General's brief in response acknowledged that defendant's claim included express malice. (See respondent's brief at page 3, stating "Appellant argues that a jury instruction explaining that evidence of his voluntary intoxication could be considered for purposes of (1) negating express malice . . . .")

The Attorney General's petition for rehearing also contends our holding produces an "incongruous" result because a defendant charged with implied malice murder cannot present evidence of voluntary intoxication, while a defendant charged with express malice—an arguably more culpable state of mind—is allowed to present such evidence. To the extent this result may be incongruous, it is a consequence of Section 29.4, which explicitly makes voluntary intoxication relevant to express malice while omitting implied malice.

Respondent's petition for rehearing is denied.

There is no change in the judgment.


Dated:_____          _____

                                                                  Márquez, J.




                                                                  _____

                                                                  Premo, Acting P.J.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041615 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SSC120180A) |
| v. | |
| JUAQUIN GARCIA SOTO, | |
| Defendant and Appellant. | |

Defendant Juaquin Garcia Soto, armed with a knife, kicked in the front door of Israel Ramirez's apartment. Upon entering the apartment, defendant found Ramirez and his partner, Patricia Saavedra, sitting in the living room watching television. The couple's young son was also in the living room. Shortly thereafter, defendant and Ramirez engaged in a knife fight in which both parties stabbed each other multiple times. Defendant then fled the scene and Ramirez died from his wounds.

At trial, Saavedra testified that defendant started the knife fight by stabbing Ramirez first. Defendant, however, claimed that Ramirez started the knife fight, forcing defendant to protect himself with his knife. Defendant also testified that he had been using alcohol and methamphetamine in the days before the offense. Based on defendant's version of events, defendant asserted a theory of imperfect self-defense.

The jury found defendant guilty of second degree murder and first degree burglary. The jury also found that defendant had used a deadly or dangerous weapon with respect to both counts. The trial court sentenced defendant to a total term of 16 years to life in prison.

Defendant raises two claims on appeal.  First, he contends the trial court erred by limiting the jury's consideration of evidence of voluntary intoxication.  Based on a modified version of CALCRIM No. 625, the trial court precluded the jury from considering evidence of defendant's voluntary intoxication with respect to his claim of imperfect self-defense.  But Penal Code section 29.4 expressly allows for consideration of voluntary intoxication with respect to express malice.  Because an actual but unreasonable belief in the need for self-defense negates express malice, Penal Code section 29.4 makes evidence of voluntary intoxication relevant to the state of mind required for imperfect self-defense.  We therefore hold the trial court erred by precluding the jury from considering evidence of defendant's voluntary intoxication with respect to his claim of imperfect self-defense.  We conclude, however, that this error was not prejudicial.

Second, defendant contends the trial court erred by excluding certain pretrial statements he made to police.  He also contends his trial counsel was ineffective by failing to introduce the statements as prior consistent statements.  We hold defendant's pretrial statements were not admissible as prior consistent statements.  Accordingly, the trial court did not err when it excluded the statements, and defense counsel was not ineffective for failing to seek their admission.

Finding no prejudicial error, we will affirm the judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts of the Offense*

1. *Overview*

The victim, Israel Ramirez, lived with his partner Patricia Saavedra and their two children in an apartment on the second floor of a two-story building in Greenfield, California.  On July 20, 2012, defendant, an unemployed 32-year-old farm worker, entered the building and went to the second floor.  First, he knocked on the door of Bernadino Solano's apartment.  When Solano opened the door, defendant stepped in,

2

briefly looked around, and left. Shortly thereafter, defendant kicked in the door of Ramirez's apartment down the hall from Solano's apartment. Ramirez, Saavedra, and their young son were sitting in the living room watching television when defendant entered the apartment.

The parties put forth different versions of the subsequent events. Saavedra testified that defendant approached them and stabbed Ramirez in the neck while the couple sat on the couch. She testified that Ramirez then went into the kitchen with defendant in pursuit while she retreated to a bedroom with their child. In his testimony, defendant admitted that he had kicked in the front door of the apartment, but he testified he was about to leave when Ramirez approached him with a knife and stabbed him first. Defendant claimed that only then did he take out his knife to defend himself.

Police found Ramirez's body lying face down in a pool of blood on the floor of the hallway outside the apartment. Defendant, who had fled the scene, was later arrested at a relative's house.

2. *Testimony of Bernadino Solano*

Bernadino Solano testified as follows. He lived with his wife and family in their second-floor apartment, neighboring Ramirez's apartment. On July 10, 2012, at around 6:00 p.m., Solano heard someone knocking loudly on his door. When Solano opened the door, he saw defendant standing there looking upset. Defendant told Solano to come out into the hallway, but Solano refused and tried to shut the door. Defendant stuck his foot inside to prevent the door from closing. He then pushed the door back open. Defendant appeared angry and was hiding his right hand behind his back. Defendant then took three steps into Solano's apartment, looked around, and walked out. While Solano closed and locked the door, his daughter called 911. About a half hour later, Solano heard noises from down the hall that sounded like a door being kicked in.

3

On cross-examination, Solano testified that defendant did not appear intoxicated. Solano admitted, however, that he had testified at the preliminary hearing that defendant appeared intoxicated.

3. *Testimony of Patricia Saavedra*

Patricia Saavedra testified as follows. She and Ramirez lived together in a second-floor apartment on Oak Avenue in Greenfield. At the time of the offense, they had been living together for about three years.

On July 10, 2012, Saavedra and Ramirez were sitting on the couch in their living room watching television. Their young son was sitting on the floor about two feet away. A renter was staying in another room of the apartment. At around 6:40 p.m., defendant kicked in the door and entered the apartment. Defendant started walking slowly towards Ramirez and Saavedra while looking from side to side. Defendant had his right hand in his front pocket. Ramirez asked defendant what he wanted. Defendant kept asking if Ramirez was alone. Ramirez and Saavedra remained seated on the couch. When defendant got to the couch, he stabbed Ramirez in the neck with a knife. Ramirez got up and went to the kitchen. Saavedra got up and grabbed her son. Defendant said something to her in English and held the knife up. Saavedra did not understand what defendant had said because she did not speak English. Defendant then followed Ramirez into the kitchen. At the same time, Saavedra took her son into a nearby room where they sheltered in place with Saavedra's young daughter.

From the other room, Saavedra could hear the sound of the two men "grabbing each other."[1] She remained in the room for about five minutes while she called 911. When she came out, defendant and Ramirez were gone. She asked the renter if he had seen Ramirez, but the renter said he had not. Saavedra then went into the hallway and saw Ramirez's dead body.

---

[1] Saavedra testified through a Spanish interpreter. The quotes are taken from the English translation of her testimony.

4

Saavedra testified that while defendant's behavior seemed strange, he did not stumble or slur his words. When asked why she remained on the couch as defendant approached, she replied that "we are not trouble makers," and "we hadn't done anything." She testified that when defendant initially broke in, she asked Ramirez, "Do you know this man? Do you have a problem with him?" Ramirez responded, "No."

4. *Testimony of Jae Yi*

Jae Yi testified as follows. Yi was the manager of a grocery store on the first floor of the building. The entrance to the upstairs apartments was behind a gated doorway around the corner on the side of the building. Yi testified that around 6:00 p.m. he heard noises upstairs that sounded like children running. He asked an employee to go upstairs and tell them to "keep it down." The employee went around to the entrance on the side of the building, came back, and told Yi there were no children upstairs. Yi then went around to the side of the building to see what was going on.

Yi found defendant inside the gated doorway, groaning and breathing heavily. Yi told him to come out, and defendant complied. Defendant was bleeding from a wound in his side, and his hand was bloody. Yi told him to sit down and offered to call an ambulance, but defendant refused. Instead, he paced back and forth on the sidewalk in front of the doorway while Yi called the ambulance. Defendant appeared to be talking to himself in Spanish. After pacing for about five minutes, defendant went into an empty parking lot on the side of a building, grabbed a sweater, and trotted down a nearby alley. A camera on the side of the building recorded video of defendant leaving the scene.

5. *Subsequent Events*

Defendant ran several blocks to the house of his former brother in law, Frank Rico. Rico testified that he awoke from a nap when his sister started yelling. He went to the living room to find defendant on the floor, bleeding and injured. Rico attempted to drive defendant to the hospital, but defendant asked to be driven to his mother's house instead. Defendant had a 24-ounce can of beer with him, and he smelled of alcohol.

5

When they arrived at defendant's mother's house, defendant's mother told him to go to the hospital, but he refused to go. Rico then drove them to defendant's brother's house in Greenfield. When they arrived, one of the residents called 911.

When the police arrived, they found defendant sitting on a couch inside the house. The police issued multiple commands to defendant to show his hands, but he did not comply. Defendant was "talking gibberish" and yelling something incomprehensible. He appeared intoxicated. The police then told defendant to get on the floor, but he again refused to comply. After about a minute, defendant lunged toward one of the officers, whereupon the officer pushed him onto the floor and took him into custody. Defendant was suffering from two puncture wounds and a laceration. Police found a bloody folding knife in defendant's rear pants pocket. DNA testing revealed that both defendant and Ramirez were contributors to blood found on the knife.

Police also found three baggies in defendant's pants pockets. The parties stipulated to the following facts. One of the baggies contained 0.02 grams of methamphetamine, and residue on the baggies tested positive for methamphetamine. A sample of defendant's urine taken at the hospital tested positive for methamphetamine, marijuana, and opiates. Defendant had been given morphine at the hospital before the sample was taken. A blood sample taken at 9:29 p.m. on the night of the offense had a blood alcohol content of 0.035 percent.

6. *Other Prosecution Evidence*

Police found the deceased body of Ramirez lying face down in a pool of blood on the floor of the hallway outside his apartment. The body was located about 15 to 20 feet from the door of the apartment, in the direction of the stairwell. A kitchen knife was found under Ramirez's right knee. Blood was dripped or smeared on the walls next to the body. Police also found blood in the kitchen and in the hallway area leading out of the kitchen towards the front door. In the kitchen, blood was found on the countertops, on dishes sitting on the counter, and on cabinet doors.

6

Police found no blood on the sofa in the living room, but a single drop of blood about one half inch in diameter was found on the floor several inches in front of the couch. DNA from this blood drop matched a sample of DNA taken from Ramirez. Police measured a distance of 24 feet between the front door and the edge of the couch.

The forensic pathologist who autopsied Ramirez's body found ten stab wounds and several other cuts, scratches, and scrapes. Among other wounds, Ramirez had suffered a stab wound to the left side of the neck going into the center of the back of the neck. This wound did not penetrate the spinal cord. Ramirez suffered another stab wound in the top of his left shoulder. Neither of these two stab wounds had penetrated any large blood vessels, and neither would have caused massive blood loss. The pathologist opined that the lack of blood on the sofa was consistent with these stab wounds being inflicted while Ramirez was on the couch. He also opined that, although the wounds would have bled, the fact that no vital blood vessels were severed meant that the blood could have dripped onto the victim's clothing.

The most critical wound was a stab wound to the upper left chest which penetrated the chest wall and punctured the heart. The large amount of blood found in the hallway next to the victim's body was consistent with the infliction of this more serious injury at that location. Ramirez also suffered multiple cuts to his arms and hands consistent with defensive wounds.

7. *Defendant's Testimony*

Defendant testified in his defense as follows. He had never seen Ramirez or Saavedra before the night of the offense. In the three- or four-day period before the offense, he had been living on the street, drinking alcohol, and using methamphetamine. His state of mind "wasn't right." Drinking alcohol and using methamphetamine over a three- or four-day period caused him to feel tired and weak. He heard voices and saw shadows.

7

On July 10, he began drinking and smoking methamphetamine early in the day, and he used methamphetamine throughout the day. He was carrying a knife that he used for field work. In the evening, he went to the Oak Avenue apartment building to seek work. He had been hired by a man outside the building a few years before. At 6:30 p.m., he went upstairs to Solano's apartment. Defendant had never met Solano before. Defendant recalled knocking on the door, stepping into the apartment, and asking if anyone else was there. He did not intend to harm anyone; he was only looking for the man who had hired him before.

After leaving Solano's apartment, defendant walked over to the next door. This time, instead of knocking on the front door, he kicked it in and saw a woman and a man inside. (In his testimony, defendant could not explain why he kicked in the door.) Defendant walked into the apartment, whereupon he saw the woman go into another room and close the door. Defendant then walked "a little past the entryway." Ramirez went the other way, into the kitchen. Defendant started walking out. When defendant was at the hallway area entering the living room, he saw Ramirez approaching him with a knife. Ramirez was swinging and "jabbing" the knife.

Defendant was scared for his life. He put up his hands and tried to defend himself. Defendant pushed Ramirez away and took out his knife, but Ramirez kept coming at him while swinging and jabbing with the knife. The two moved around, fighting each other with their knives in the hallway and in the kitchen area of the apartment. At some point, defendant pushed Ramirez away and "took off running." Defendant was not sure whether he or Ramirez had been stabbed inside the apartment.

Defendant ran into the hallway outside the apartment, but Ramirez followed right behind him with the knife. Defendant was moving backwards and trying to block the knife while Ramirez was swinging it at him. Defendant tripped and fell backwards, and Ramirez landed on top of him. Ramirez tried to stick his knife into defendant's chest with both hands. Defendant was scared for his life. While holding Ramirez's arm with

8

his left hand, he began stabbing Ramirez with the knife in his right hand. Defendant then felt Ramirez "freeze up" and collapse on top of him. Defendant slid out from under Ramirez, got up, and went downstairs, where he encountered Yi. Defendant paced back and forth while Yi went to call for help. At some point, defendant decided "they were taking too long, so [he] just ended up leaving."

8. *Expert Witness Testimony on Psychological Effects of Methamphetamine*

Dr. Amanda Gregory, a neuropsychologist, testified for defendant as an expert on methamphetamine induced psychosis. Dr. Gregory opined that defendant was suffering from a methamphetamine-induced psychotic disorder at the time of the offense. Persons suffering from this disorder experience paranoia and delusional thinking, causing them to falsely believe that others are threatening them. Furthermore, sleep deprivation caused by methamphetamine use negatively affects users' ability to process information, form judgments, and make good decisions. Methamphetamine users may also experience hallucinations, such as hearing voices or seeing things that are not there. As a result of paranoid delusions, persons suffering from a methamphetamine-induced psychotic disorder may misperceive interactions with others, perceiving threats when there are no actual threats.

Dr. Gregory observed conduct by defendant consistent with this psychotic disorder, such as incoherent explanations and disorganized behavior. Defendant's actions on the day of the offense were consistent with her diagnosis, showing impulsiveness and poor decisionmaking. Dr. Gregory had also observed these symptoms in a video of defendant being interviewed at the hospital where he appeared disoriented and incoherent at times. Dr. Gregory conceded this behavior could have been the effect of the pain medication defendant had been given.

B. *Procedural Background*

The prosecution charged defendant by information with: Count One—First degree murder (Pen. Code, § 187, subd. (a)); and Count Two—First degree burglary (Pen. Code,

9

§ 459).[2]  As to both counts, the information alleged defendant had personally used a dangerous or dangerous weapon—a knife—in the commission of the offense.  (Pen. Code, § 12022, subd. (b).)  The case proceeded to trial in June 2014.

On Count One, the jury acquitted defendant of first degree murder but found him guilty of second degree murder.  On Count Two, the jury found defendant guilty of first degree burglary.  The jury found the enhancements true as to both counts.

The trial court imposed a term of 15 years to life on Count One with one additional consecutive year for the weapon use enhancement.  On Count Two, the court imposed the upper term of six years plus one additional year for the enhancement, both concurrent with the term on Count One.

## II. DISCUSSION

A. *Instruction Limiting Consideration of Evidence of Voluntary Intoxication*

Defendant contends the trial court erred by instructing the jury that evidence of his voluntary intoxication could not be considered in deciding whether he acted in imperfect self-defense.  The Attorney General contends defendant forfeited this claim by failing to request a modification to the instruction as given, and she argues that the instruction was correct regardless.  We conclude the trial court erred by precluding the jury from considering voluntary intoxication with respect to imperfect self-defense because Penal Code section 29.4 (Section 29.4) makes voluntary intoxication relevant to express malice. We conclude, however, that this error was not prejudicial under state law.

1. *Procedural Background*

The trial court instructed the jury on the elements of first and second degree murder with malice aforethought, and on first degree felony murder in the commission or attempted commission of a burglary.  As to malice, the court instructed the jury on

---

[2] The information had also charged the burglary of Solano's apartment as Count Three, but the prosecution dismissed that charge before trial.

10

express and implied malice based on CALCRIM No. 520. The court also instructed the jury on justifiable homicide in self-defense based on CALCRIM No. 505.

The court also instructed the jury on voluntary manslaughter under a theory of imperfect self-defense based on CALCRIM No. 571. In addition to the language of the pattern instruction, the court instructed the jury as follows: "Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is legally justified in resorting to self-defense against the defendant. But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant. [¶] Imperfect self-defense does not apply to purely delusional acts. Imperfect self-defense is not a defense to felony murder."

With respect to voluntary intoxication, the court instructed the jury based on a modified version of CALCRIM No. 625, as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted. Voluntary intoxication can only negate express malice, not implied malice. [¶] A person is voluntarily intoxicat[ed] if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or logically assuming the risk of that effect. You may not consider evidence of voluntary intoxication for any other purposes."[3]

---

[3] The court also instructed the jury with CALCRIM No. 626 (unconsciousness from voluntary intoxication reduces the offense to involuntary manslaughter) and CALCRIM No. 3426 (voluntary intoxication may be considered as to the specific intent required for burglary). Those instructions are not at issue in this appeal.

11

2. *Legal Principles*

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) California law recognizes three theories of second degree murder: Unpremeditated murder with express malice, implied malice murder, and second degree felony murder.[4] (*People v. Swain* (1996) 12 Cal.4th 593, 601 (*Swain*).) Express malice exists "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (Pen. Code, § 188.) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*)

"Manslaughter is the unlawful killing of a human being *without* malice." (Pen. Code, § 192, italics added.) "The vice is the element of malice; in its absence the level of guilt must decline." (*People v. Flannel* (1979) 25 Cal.3d 668, 680 (*Flannel*), superseded by statute on other grounds.) When a defendant intentionally kills based on an honest belief in the need for self-defense, but this belief is not objectively reasonable, the defendant acts in "imperfect" or "unreasonable" self-defense. This state of mind negates malice, reducing the offense to voluntary manslaughter. "It is the honest belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing." (*Id.* at p. 679.) "*An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.*" (*Id.* at p. 674, italics in original.)

---

[4] The trial court did not instruct the jury on second degree felony murder.

Section 29.4[5] circumscribes the use of evidence of voluntary intoxication, as follows:  "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act."  (Pen. Code, § 29.4, subd. (a).)  Subdivision (b) of Section 29.4 then provides:  "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, *when charged with murder*, whether the defendant premeditated, deliberated, or *harbored express malice aforethought*."  (Pen. Code, § 29.4, subd. (b), italics added.)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration."  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  "The appellate court should review the instructions as a whole to determine whether it is 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence in deciding [the relevant issue].  [Citation.]  Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' "  (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135 (*Mendoza*).)

---

[5] Former Penal Code section 22 was renumbered Section 29.4 without substantive change.  (Stats. 2012, ch. 162, § 119, p. 2617.)  We refer to the statute alternately as Section 29.4 and former Section 22 depending on the context.

13

3. *Forfeiture*

The Attorney General contends defendant forfeited his claim because he failed to request a modification of the instruction on voluntary intoxication.[6] She argues that the trial court had no sua sponte duty to give the instruction, such that it was incumbent upon defendant to request a pinpoint instruction clarifying the pattern language, if defendant desired such an instruction.

The Attorney General is correct that a trial court has no sua sponte duty to give an instruction on voluntary intoxication. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 (*Saille*) [instructions on voluntary intoxication are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte].) However, if a court gives such an instruction, it must do so correctly. (*Mendoza*, *supra*, 18 Cal.4th at p. 1134, citing *People v. Castillo* (1997) 16 Cal.4th 1009, 1014-1015.) Because the court here instructed the jury on voluntary intoxication, we will consider whether it did so correctly. (See also Penal Code section 1259 [appellate courts may review any instruction given, refused or modified, even if no objection was made thereto in the lower court, if the substantial rights of the defendant were affected].)

4. *The Instruction Erroneously Excluded Consideration of Voluntary Intoxication as to Imperfect Self-Defense*

Defendant argues that evidence of his voluntary intoxication was relevant to the question of whether he held an honest or actual belief in the need for self-defense. For this proposition, he relies on *People v. Cameron* (1994) 30 Cal.App.4th 591 (*Cameron*). In *Cameron*, the court of appeal held that the trial court erred by giving a jury instruction that implied voluntary intoxication could not be considered in finding a defendant guilty of second degree murder under a theory of implied malice. The *Cameron* court relied on the Supreme Court's holding in *People v. Whitfield* (1994) 7 Cal.4th 437, which made

---

[6] The Attorney General does not argue invited error.

14

evidence of voluntary intoxication admissible in a prosecution for second degree murder based on an implied malice theory. However, as the Attorney General points out, the Legislature subsequently amended former Penal Code section 22 in response to *People v. Whitfield*, effectively abrogating its primary holding. (Stats. 1995, ch. 793, § 1.) The revision to former Penal Code section 22 casts doubt on the validity of *Cameron*, at least as to the relevance of voluntary intoxication to implied malice. (See *People v. Timms* (2007) 151 Cal.App.4th 1292, 1298 (*Timms*) [with the 1995 amendment, voluntary intoxication is no longer admissible to negate implied malice].) Nonetheless, the trial court here also instructed the jury on—and the prosecution largely relied upon—an *express* malice theory of murder.

Section 29.4 makes evidence of voluntary intoxication admissible on the issue of whether a defendant charged with murder harbored express malice. And the jury was properly instructed that voluntary intoxication may negate express malice. But the jury was also instructed it could only consider voluntary intoxication "in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted." By its terms, this latter instruction precluded the jury from considering evidence of voluntary intoxication in deciding whether defendant had an honest but unreasonable belief in the need for self-defense. The instruction ran afoul of Section 29.4 because the state of mind required for imperfect self-defense negates express malice, and Section 29.4 by its express terms makes voluntary intoxication admissible on the issue of express malice. (*Flannel*, *supra*, 25 Cal.3d at p. 672 [one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter].) The Supreme Court recently underscored this principle in *People v. Elmore* (2014) 59 Cal.4th 121 (*Elmore*): "Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*Id.* at p. 133.) Our high

15

court went on to observe that: " ' "A person who actually believes in the need for self-defense necessarily believes he is acting lawfully." [Citation.] Because express malice requires an intent to kill unlawfully, a killing in the belief that one is acting lawfully is not malicious. The statutory definition of implied malice does not contain similar language, but we have extended the imperfect self-defense rationale to any killing that would otherwise have malice, whether express or implied.' " (*Id.* at p. 134, quoting *People v. Anderson* (2002) 28 Cal.4th 767, 782, fn. omitted.)

Because imperfect self-defense negates express malice, and because evidence of voluntary intoxication is admissible as to a finding of express malice, the trial court's instruction erroneously precluded the jury from considering voluntary intoxication in determining whether defendant acted in imperfect self-defense.

The Attorney General argues that the instruction is correct because "it amounts to little more than a restatement" of Section 29.4. But a close examination reveals a flaw in the instruction. The instruction allowed the jury to consider evidence of voluntary intoxication in deciding whether the defendant harbored an "intent to kill." But express malice is not equivalent to an intent to kill. Malice is express "when there is manifested a deliberate intention *unlawfully* to take away the life of a fellow creature." (Pen. Code, § 188, italics added.) "[M]alice requires an *intent to kill* that is 'unlawful' because the law deems it so. ' "The adverb 'unlawfully' in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing recognized by the law." ' " (*Elmore*, *supra*, 59 Cal.4th at p. 133, quoting *Saille*, *supra*, 54 Cal.3d at p. 1115.) In other words, when a defendant honestly believes in the need for self-defense, the intent to kill is not "unlawful" under Penal Code section 188 and, therefore, express malice is negated.

The Attorney General cites two cases upholding CALCRIM No. 625. (See *People v. Turk* (2008) 164 Cal.App.4th 1361, 1381-1384 (*Turk*) [CALCRlM No. 625 correctly states the law regarding voluntary intoxication]; *Timms*, *supra*, 151 Cal.App.4th at

16

p. 1298 [instruction based on CALCRlM No. 625 was in accord with former section 22].) *Timms* solely concerned the relevance of voluntary intoxication to *implied* malice, not express malice. *Timms* therefore does not control the issue presented here—whether voluntary intoxication is relevant to *express* malice. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.)

In *Turk*, the trial court instructed the jury, based on a modified version of CALCRIM No. 625, that its consideration of voluntary intoxication was limited to "deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation." (*Turk*, *supra*, 164 Cal.App.4th at p. 1369.) On appeal, the defendant argued that the instruction precluded the jury from considering whether his voluntary intoxication negated malice aforethought. At trial, however, the defendant had not put forth any theory of imperfect self-defense or heat of passion. On those facts, the court of appeal first held that voluntary intoxication did not negate implied malice. (*Id.* at pp. 1376-1377.) As to express malice, the court observed that the concept of express malice is "in essence" the same concept as intent to kill in the absence of imperfect self-defense or heat of passion. (*Id.* at p. 1382.) The court stated, "Any distinction between the two concepts comes from the fact that 'unreasonable self-defense or a heat of passion defense can further reduce an intentional killing to voluntary manslaughter.' " (*Ibid.*, quoting *Swain*, *supra*, 12 Cal.4th at p. 601, fn. 2.) Because the trial court in *Turk* had instructed the jury that voluntary intoxication could be considered with respect to an intent to kill, the court of appeal concluded that the trial court had properly instructed the jury on the relevance of voluntary intoxication to express malice. The court of appeal had no occasion to consider whether voluntary intoxication could be considered with respect to imperfect self-defense or heat of passion because the defendant in *Turk* never asserted those theories. Accordingly, *Turk* is also inapt.

17

Considering the trial court's instructions as a whole, we conclude it was reasonably likely the jury construed the instruction as precluding it from considering voluntary intoxication with respect to defendant's claim of imperfect self-defense. As noted above, the trial court's instructions contained conflicting directions. The court properly instructed the jury that voluntary intoxication can negate express malice. And the jury was properly instructed that the "defendant acted with express malice if he *unlawfully* intended to kill." (Italics added.) But the court also instructed the jury that evidence of voluntary intoxication could be considered "only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted." The instruction concluded: "You may not consider evidence of voluntary intoxication for any other purposes."

We think it is reasonably likely the jury understood this language to mean that it could not consider voluntary intoxication in deciding whether defendant harbored an honest but unreasonable belief in the need for self-defense. While the trial court instructed the jury that express malice requires an unlawful intent to kill, the jury was not instructed that an "unlawful intent" excludes the state of mind held by a defendant who acts in imperfect self-defense. It is highly unlikely the jury could have inferred this point. Furthermore, the prosecutor reinforced an erroneous understanding of the law in his closing arguments. First, he argued that voluntary intoxication "[d]oesn't apply to second degree murder." He then specifically added, "voluntary intoxication cannot be considered for imperfect self-defense."[7]

---

[7] Defense counsel did not object to either statement.

18

For these reasons, we conclude the trial court erred by including an instruction that precluded the jury from considering whether evidence of voluntary intoxication supported a finding of imperfect self-defense.[8]

5. *The Erroneous Instruction Was Harmless*

Defendant contends he was prejudiced by the erroneous instruction under the federal harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) [the burden is on the prosecution to show the error was harmless beyond a reasonable doubt].) He argues that the federal standard applies because the error violated his due process rights by wrongly instructing the jury on an element of the offense and relieving the prosecution of its burden to prove all elements beyond a reasonable doubt. The Attorney General contends that any error solely concerned the admission of evidence under state law, such that the error was harmless unless it was reasonably probable the jury would have reached a result more favorable to defendant in the absence of error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

The California Supreme Court has held that instructional error restricting a jury's consideration of voluntary intoxication amounts to state law error only. (*Mendoza*, *supra*, 18 Cal.4th at pp. 1134-1135.) In *Mendoza*, our high court considered the effect of a trial court's erroneous failure to instruct a jury that voluntary intoxication could be considered with respect to the state of mind required for aiding and abetting. The court concluded that "[a]ny error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' " (*Ibid.*, quoting *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089.) We find this

---

[8] The Attorney General does not argue that the instruction should not have been given on the ground that defendant's belief in the need for self-defense was purely delusional. (See *Elmore, supra,* 59 Cal.4th at p. 960.) Regardless, the record contains substantial evidence from which reasonable jurors could have found that defendant's belief in the need for self-defense was not entirely delusional.

19

reasoning equally applicable here.  (See also *People v. Atkins* (2001) 25 Cal.4th 76, 93 [application of former Penal Code section 22 did not violate due process].)

Defendant's position that the *Chapman* standard applies finds some support in the opinions of several United States Supreme Court justices in *Montana v. Egelhoff* (1996) 518 U.S. 37 (*Egelhoff*).  There, the court considered the effect of a Montana law restricting juries from considering voluntary intoxication in determining the state of mind required for any criminal offense.  Based on historical common law principles, a four justice plurality held the law did not violate federal due process standards.  (*Id.* at p. 51 (plur. opn. of Scalia, J.).)  Justice Ginsburg concurred on the ground that a state is not constitutionally prohibited from defining mens rea so as to eliminate the exculpatory nature of voluntary intoxication.  (*Id.* at pp. 58-59 (conc. opn. of Ginsburg, J.).)  But Justice Ginsburg distinguished the Montana statute from evidentiary rules that are unconstitutional because they prevent the defendant from introducing relevant, exculpatory evidence that could negate an essential element of the offense.  Four justices dissented and would have held the Montana law violated due process by preventing the jury from considering evidence relevant to the defendant's mens rea.  (*Id.* at p. 93 (dis. opn. of O'Connor, J.).)

The instruction at issue here arguably prevented the jury from considering evidence which California law makes relevant to an element of the offense, such that Justice Ginsburg and the four dissenting justices in *Egelhoff* might have held it unconstitutional.  However, absent a clearer statement of the law from the United States Supreme Court, we are bound by the precedent set forth by this state's high court in *Mendoza*.  (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450.)

Applying the *Watson* standard for prejudice, we are not convinced there was a reasonable probability the jury would have reached a more favorable outcome in the absence of the instructional error.  First, as a general matter, we recognize that many

juries may be reluctant to mitigate a defendant's liability based on voluntary intoxication. "Evidence of intoxication, while legally *relevant*, may be factually unconvincing. [. . .] Juries may and, no doubt, often do reject an intoxication claim." (*Mendoza*, *supra*, 18 Cal.4th at p. 1134, italics in original.) Second, the trial court properly instructed the jury that imperfect self-defense does not apply if the defendant's conduct creates circumstances in which the victim is justified in resorting to self-defense. By his own admission, defendant entered the victim's apartment unannounced by kicking in the front door while Ramirez and Saavedra sat on the couch with their young child on the floor in front of them. Most juries would likely conclude defendant had no right to imperfect self-defense under those circumstances. Defendant argues that the jury could have found he regained the right to imperfect self-defense when Ramirez chased him into the hallway and attacked him as he was attempting to leave. According to defendant's version of events, he tripped and fell backwards in the hallway as Ramirez advanced on him with the knife. Ramirez then landed on top of him and attempted to stab him in the chest, whereupon defendant began stabbing Ramirez. Even assuming the jury might have credited this testimony, evidence of voluntary intoxication would not have supported a claim of imperfect self-defense on these facts.

Third, defendant's claim of imperfect self-defense was incompatible with the testimony of Saavedra, who testified that defendant approached Ramirez and stabbed him in the neck before Ramirez retreated to the kitchen. Saavedra's version of events was supported by the drop of Ramirez's blood found on the floor several inches in front of the couch.[9] By contrast, defendant claimed he and Ramirez fought near the entryway of the apartment and in part of the kitchen, but he denied approaching the couch. Based on the

---

[9] Defendant contends police did not find this drop of blood until two days after the stabbing. Police failed to secure the scene of the crime, and much of the blood evidence had been cleaned up or altered in the two days between the stabbing and the subsequent examination of the apartment. But Sergeant Michael Rice testified he personally witnessed the blood drop in front of the couch on the night of the offense.

prosecution's photographs and the layout of the apartment, defendant's version of events was inconsistent with the presence of the blood drop in front of the couch. Finally, the jury might have found defendant's belief in the need for self-defense was entirely delusional. For these reasons, the jury likely would have rejected defendant's claim of imperfect self-defense regardless of whether the trial court had properly instructed it on voluntary intoxication.

In sum, we conclude the instructional error constituted a violation of state law, but we find the error was not prejudicial because it is not reasonably probable the error " 'affected the verdict adversely to defendant.' " (*Mendoza*, *supra*, 18 Cal.4th at pp. 1134-1135.) Accordingly, this claim does not require reversal.

B. *Exclusion of Defendant's Pretrial Statements to Police*

Defendant contends the trial court also erred by excluding certain statements he made to police after he was arrested. Because his trial counsel never offered these hearsay statements as prior consistent statements under Evidence Code sections 791 and 1236, defendant contends his trial counsel was ineffective. The Attorney General argues that the trial court properly excluded the statements, and that the statements were not admissible as prior consistent statements. We hold the trial court did not err by excluding defendant's pretrial statements to police, and trial counsel was not ineffective by failing to seek their admission as prior consistent statements.

1. *Factual and Procedural Background*

After police arrested defendant, they interviewed him at the hospital. In the course of the interview, defendant made several exculpatory statements. Among other things, he said he was at the apartment building because he had no money, and he went upstairs to "ask for help" because he thought a person he knew was living there. Defendant repeatedly claimed he stabbed Ramirez in self-defense after Ramirez "rushed me" and "came at me with a big ol' fucking knife." With respect to who started the knife fight,

22

defendant said, "He stabbed me first." Defendant also told the medical staff he did not use any drugs other than marijuana, and that he had only been drinking beer.

The prosecution moved in limine to exclude defendant's exculpatory statements as inadmissible hearsay under Evidence Code section 1200. The prosecution also moved to admit defendant's denial of drug use as a statement by a party opponent under Evidence Code section 1220. The prosecutor argued that the latter statement could be admitted without requiring admission of the exculpatory statements under Evidence Code section 356 (the rule of completeness) because the two categories of statements concerned completely separate topics.

The trial court found defendant's statements about the knife fight distinct from his statements about his drug use and ruled that the former statements were "not necessary to understand the comments about the drugs and alcohol." Accordingly, the court granted the prosecution's motions.

2. *Legal Standards*

"Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." (Evid. Code, § 1236.) Evidence Code section 791 provides, in relevant part: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶ . . . ¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791.)

To demonstrate ineffective assistance of counsel, defendant must first show counsel's performance was deficient because counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland v.*

23

*Washington* (1984) 466 U.S. 668, 687-688.)  Second, he must show prejudice flowing from counsel's performance or lack thereof.  (*Id.* at pp. 691-692.)

3. *Defendant's Pretrial Statements Were Not Admissible As Prior Consistent Statements*

Defendant concedes his trial counsel never sought admission of the pretrial statements to police as prior consistent statements.  He nonetheless contends the trial court should have admitted the statements under that hearsay exception.  But our Supreme Court has held this issue is not cognizable on appeal where defendant fails to present that theory of admissibility at trial.  (*People v. Ervine* (2009) 47 Cal.4th 745, 779.)

Defendant contends in the alternative that his trial counsel was ineffective for failing to seek admission of the pretrial statements as prior consistent statements.  He contends the prosecutor on cross-examination challenged the credibility of his testimony that Ramirez initiated the knife attack, thereby triggering subsection (b) of Evidence Code section 791.  The Attorney General does not refute that the prosecutor challenged the credibility of defendant's testimony, but she contends his pretrial statements were not admissible under Evidence Code section 791 because defendant had a motive to fabricate the statements when he made them.  We agree with the Attorney General.

A witness's prior statements are not admissible under Evidence Code section 791 unless they were made before the motive to fabricate arose.  Defendant was under arrest for the knife attack when he made his statements to the police.  At the time, he had an obvious motive to fabricate exculpatory evidence:  to avoid being punished for killing Ramirez.  (*People v. Smith* (2003) 30 Cal.4th 581, 630; *People v. Hitchings* (1997) 59 Cal.App.4th 915, 921.)

Defendant acknowledges he had a motive to fabricate his statements after he was arrested.  But he contends his statements were nonetheless admissible because a prior statement is deemed admissible as long as the statement is made before any one of

24

multiple motives for fabrication arose. He argues that the subsequent charges of murder against him constituted a separate motive to fabricate, and that his prior statements were admissible because he made them before that additional motive arose. For this proposition, defendant relies on *People v. Jones* (2003) 30 Cal.4th 1084 (*Jones*), and similar cases. (See *People v. Noguera* (1992) 4 Cal.4th 599; *People v. Ainsworth* (1988) 45 Cal.3d 984.)

These cases concerned the admissibility of prior statements made by a prosecution witness or a codefendant adverse to the defendant. For example, in *Jones*, the defendant was charged with the murder of a restaurant manager during a robbery of the restaurant. A prosecution witness—a friend of the defendant who waited in a car during the robbery—testified that defendant had a revolver in his possession after the robbery. (*Jones*, *supra*, 30 Cal.4th at pp. 1098-1099.) On cross-examination, the defense attorney impeached the witness on the ground that the prosecution had offered him a favorable plea bargain in connection with an unrelated offense. In response, the prosecution offered a prior consistent statement the witness had made when the police first contacted him about the murder. The defendant objected on the ground that the witness had a motive to fabricate the initial statement because he feared prosecution for the murder at the time he made the statement. The Supreme Court held that the prior statement was admissible under Evidence Code section 791 because the witness made the statement before the plea bargain was struck. (*Id.* at pp. 1106-1107.) The court acknowledged the witness had a motive to fabricate at the time of the statement, but the court reasoned that the motive created by the subsequent plea bargain constituted a *separate, additional* motive. Because the witness made the prior statement before the additional motive arose, the court held the statement admissible under subdivision (b) of Evidence Code section 791. (See *People v. Andrews* (1989) 49 Cal.3d 200, 210, overruled on other grounds by *People v. Trevino* (2001) 26 Cal.4th 237 [prosecution entitled to show that witness's

25

testimony was consistent with a prior statement given shortly after arrest but before a possible sentence modification provided an additional motive to testify].)

Here, defendant's motive to fabricate his testimony was the same as the motive he had when he gave his prior statements following his arrest: the desire to avoid punishment for the offense. We disagree with defendant that the bringing of charges against him constituted a separate, additional motive to fabricate. Accordingly, *Jones* and similar cases do not support his argument, and this claim is without merit.

4. *Cumulative Error*

Finally, defendant contends the cumulative effect of the prejudice from both alleged errors requires reversal. We find only one error, which we conclude was not prejudicial; there are no additional errors to cumulate. We therefore conclude this claim is without merit.

### III. DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
 Rushing, P.J.

_____
 Premo, J.

No. H041615
The People v. Soto

| | |
|---|---|
| Trial Court: | Monterey County<br>Superior Court No.: SSC120180A |
| Trial Judge: | The Honorable Carrie M. Panetta |
| Attorney for Defendant and Appellant<br>Juaquin Gacia Soto: | Stephen B. Bedrick<br>under appointment by the Court of<br>Appeal for Appellant |
| Attorneys for Plaintiff and Respondent<br>The People: | Kamala D. Harris,<br>Attorney General of California |
| | Gerald A Engler,<br>Chief Assistant Attorney General |
| | Jeffrey M. Laurence,<br>Senior Assistant Attorney General |
| | Seth K. Schalit,<br>Supervising Deputy Attorney General |
| | Kevin Kiley,<br>Deputy Attorney General |
| | Amit Kurlekar,<br>Deputy Attorney General |

People v. Soto
H041615